UNITED STATES of America, ex rel., P. Robert PRATT, individually, Plaintiffs,

v.

ALLIANT TECHSYSTEMS, INC. a Delaware Corporation, and Hercules Incorporated, a Delaware Corporation, Defendants.

No. CV 95-4812 CM.

United States District Court, C.D. California.

Jan. 21, 1999.

Howard F. Daniels, AUSA-Office of U.S. Attorney, Civil Division, Los Angeles, CA, Michael F. Hertz, Joyce R. Branda, Daniel A. Spiro, Dennis L.Phillips, U.S. Dept. of Justice, Civil Division, Washington, DC, for plaintiffs.

Roman M. Silberfeld, Robins Kaplan Miller & Ciresi, Los Angeles, CA, Robert K. Huffman, Carol J. Banta, Brian A. Hill, Miller & Chevalier, Washington, DC, for defendants.

## ORDER GRANTING APPROVAL OF THE PROPOSED SETTLEMENT AND DISMISSING THE ACTION WITH PREJUDICE

MORENO, District Judge.

On December 14, 1998, the parties' stipulated motion for approval of the settlement agreement and dismissal of the action came on for hearing before this Court. At that time, the Court instructed the parties to engage in further discussions regarding the terms of the settlement agreement. The Court has read and considered the correspondence summarizing the status of those discussions, all pleadings and papers in the Court's file, and all relevant and admissible evidence in support of and against the stipulated motion.

Having considered all of the above, the Court elects to approve the settlement, notwithstanding the United States' objections.

## I.

### Introduction and Factual Summary

Robert Pratt, the qui tam relator in this action, was an employee of Hercules and Alliant at their rocket motor manufacturing facility in Magna, Utah, from 1984 until 1995. Generally, his complaint alleged that Defendants perpetrated a massive fraud involving numerous military programs for which they substantially overcharged the United States. Specifically, Pratt's original Complaint alleged that beginning in March of 1992, Hercules, and subsequently Alliant, violated the False Claims Act at the Magna facility by mischarging and overcharging labor costs on six government programs: Delta, Titan IV, Trident II, Pegasus, Intermediate Nuclear Forces ("INF") Treaty, and the START Treaty.

Under the False Claims Act, any person who defrauds the United States Government is liable for civil penalties. 31 U.S.C. § 3729 (1994). In a qui tam action, the relator sues on behalf of the government in addition to himself. If he or she prevails, he or she receives a percentage of the recovery, with the remainder to be paid to the government. *United States v. Board of Trustees,* 161 F.3d 533, 1998 WL 762525 at *1 (9th Cir. Nov.3, 1998).

The FCA requires the United States Department of Justice to investigate the relator's allegations at the outset and to decide whether to intervene and take over its prosecution. In the event DOJ decides not to intervene, the statute gives the relator "the right to conduct the action." § 3730(b)(4) and (c)(3). This right "obviously includes the right to negotiate a settlement in that action," subject to court approval. *United States ex rel. Killingsworth v. Northrop Corp.,* 25 F.3d 715, 722 (9th Cir.1994).

On November 15, 1995, Pratt filed a First Amended Complaint that generally repeated the FCA allegations of his original Complaint, but added a cause of action for retaliatory action under the FCA and for wrongful termination under state law. The First Amended Complaint also alleged labor mischarging or overcharging on four additional programs: Trident I, Peacekeeper (MX), Poseidon, and Polaris.

In this case, DOJ conducted an investigation of Pratt's FCA allegations and reached a settlement agreement with Defendants regarding the portion of the allegations with respect to the Intermediate Nuclear Forces ("INF") Treaty. This Court approved the settlement agreement and dismissed Pratt's allegations regarding the INF program with prejudice on March 18, 1998. At the same time, DOJ formally declined to intervene in the action as to the remainder of Pratt's FCA allegations.

Consequently, the Court directed Pratt to file a Second Amended Complaint, limited to the non-settled allegations within 30 days. Pratt did so, and the Complaint essentially repeated his prior claims of labor mischarging and overcharging against the previously listed programs (with the exception of the INF program), wrongful discharge, and wrongful termination.

Following DOJ's decision not to intervene, both Pratt and Defendants filed motions with the Court based on a pre-existing qui tam suit against Hercules that is currently pending in Utah. *United States ex rel. Hullinger v. Hercules, Inc.,* Civil Action No. 92– CV–0085 (D.Utah). When Pratt filed his original Complaint in July 1995, this *qui tam* action was pending against Hercules, but not Alliant, alleging labor mischarging (among other types of overcharging) at the same facility. The relators in the *Hullinger* action were four former employees who had been laid off in 1991. In March of 1992, the Hullinger relators filed a First Amended Complaint, which was investigated by DOJ for the possibilities of intervention. In 1994, DOJ notified the court that it was unwilling to intervene in the case, and it was unsealed

thereafter and served on Hercules. Settlement is currently pending in the matter.

Pratt's action differed in several major respects from *Hullinger:* for example, its allegations involved two additional programs against Alliant, the INF and START programs; and a different time period and defendant. Nonetheless, the two cases were certainly influenced by each other. Following DOJ's decision not to intervene in the other claims pending before this Court in March, Pratt moved to transfer this action to the District of Utah for the convenience of the parties and witnesses pursuant to 28 U.S.C. § 1404(a). Defendants, who opposed transfer, simultaneously moved to dismiss the Second Amended Complaint on the grounds that the pre-existence of *Hullinger* and the "public disclosure" in that action deprived the Court of subject matter jurisdiction over Pratt's FCA claim. Furthermore, Hercules and Alliant moved to dismiss Pratt's retaliatory discharge and wrongful termination claim on the grounds that they failed to state a claim under applicable law. However, before the Court was able to decide those motions, the parties in *Hullinger* decided to reach settlement, a factor which undoubtedly motivated the parties in this action to seek the same resolution.

Consequently, the motions were taken off calendar in lieu of a stipulated motion requesting approval of the settlement and a dismissal of the case with prejudice, currently before this Court. During this period, however, Robert Pratt passed away on November 5, 1998 due to an unfortunate accident. On December 10, 1998 the parties filed a stipulated Rule 25(a) motion and order to substitute the decedent's father and Special Administrator, Robert N. Pratt, as Plaintiff/Relator in this action.

The Settlement Agreement principally provides that "in settlement of all claims by Pratt and his counsel, including all claims by Pratt on· behalf of the United States, Hercules and Alliant agree to pay Pratt and his counsel the total sum of One Million One Hundred Fifty Thousand and

No/100th dollars ($1,150,000.00)." The Agreement then sets forth, subject to Court approval, the portions of the total settlement amount allocated to each of the various claims of Pratt and his counsel in the action. *Id.* The Agreement allocates $500,000 to Pratt's retaliatory action and wrongful termination claims, and $150,000 to Pratt's legal fees and expenses. The Agreement further provides, in consideration for payment of $500,000 to settle Pratt's FCA Claim, a release by Pratt on behalf of himself and the United States from the claims asserted in Paragraphs 8 through 19 of Pratt's Second Amended Complaint. The United States is to receive 72 percent of this amount, totalling $360,000. Pratt receives $140,000, or 28 percent.

### A. *DOJ'S Objections*

DOJ has expressed objections with respect to the settlement arrangement specified in this case. First, DOJ objects to a provision releasing Defendants from potential False Claims Act liability. Apparently, the "release" language in the proposed settlement provides that the United States would release liability under the FCA for all of "the claims asserted in Paragraphs 8 through 19 of the ... Second Amended Complaint." *Joint Memorandum in Support of their Stipulated Motion for Approval of the Settlement Agreement and Dismissal of the Action* ("Joint Settlement Memo") at 119. The United States argues that this proposal is an overbroad release, minimally investigated, and provides insufficient recovery.

The United States' further remarks that the settlement would "[b]arter away the Government's rights in exchange. for a minimal, inadequately justified, and speculative recovery." *Id* at 8. Despite a claim totalling several hundred million dollars, the proposed settlement would provide the United States with a maximum of $360,000, a substantially reduced amount compared to the hundreds of millions of dollars allegedly originally at stake.

An additional objection involves the omission of a provision that prohibits Defendants from allocating settlement payments and other costs incurred as overhead to other Government contracts, or in any other way charging the Government for these payments or costs. According to the United States, Defendants provide no details as to the magnitude of the costs in this proceeding that they may intend to recoup from the Government through any such means.

### B. Subject–Matter Jurisdiction

As a final matter, the United States also argues that this Court does not enjoy subject matter jurisdiction over the False Claims Act allegations of relator's Second Amended Complaint by virtue of the previous filing and public disclosure the *Hullinger* qui tam action pending in the State of Utah that challenged the same allegedly fraudulent scheme. When "a person brings an action under this section [a qui tam action], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." See 31 U.S.C. § 3730(b)(5), *United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.* ("LaCorte"), 149 F.3d 227 (3rd Cir.1998). It is true that some federal courts have rejected attempts by relators to avoid jurisdictional bars of the FCA by contending that their complaints cover a later time period than publicly disclosed allegations. *See, for example, Hyatt v. Northrup Corp,* 1989 U.S.Dist. LEXIS at *4, 14 (C.D.Cal. Dec. 27, 1989).

Here, the United States contends that the 1992 filing of the First Amended Complaint in *Hullinger* triggered the applicability of the first in time rule to preclude the Court from considering the allegedly later-filed Pratt litigation. Since *Hullinger* involved allegations of labor mischarging at the same defense contracting facility, involved many of the same programs, and occurred during a continuous time period, the United States alleges that Pratt is barred from asserting his claim.

These issues were previously addressed and briefed by the parties in earlier motions that were taken off calendar because of the impending settlement hearing. When relator moved to transfer this case to Utah in June, he conceded that the cases "present[ed] factual and legal questions which suggest the wisdom of this matter also being heard in the same district as Utah, possibly as a consolidated case." Motion to Transfer Action for Convenience at 2. Despite the admitted similarities, however, Plaintiff contends that the first in time rule does not apply because the two cases involve "distinct time periods, distinct transactions and invoices, in various instances, distinct programs and contracts, and a completely distinct defendant." Opposition to Motion to Dismiss at 21.

In addition, the United States also argues that the case is barred by the public disclosure provision of 31 U.S.C. § 3730(e)(4)(A), which states

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

The jurisdictional bar prohibiting qui tam actions based on public disclosures is triggered when (a) information has been disclosed in a public setting, and (b) the relator's complaint is "based upon" that prior disclosure. *United States ex rel. Biddle v. Board of Trustees of Stanford Univ.,* 161 F.3d 533, 535–39 (9th Cir.1998). If the two conditions apply, the *qui tam* suit is barred unless the relator can establish that he was an original source of the informa-

tion on which the public disclosure was based. *Id.*

On December 14, 1998 a hearing was held before the Court regarding the settlement proposal under *Killingsworth.* At the hearing, the Court requested that the parties make additional efforts to resolve the matter amicably and to report back to the Court by January 5, 1999 concerning these efforts. Since the December 14 hearing, the parties continued to negotiate to resolve the matter, but to no avail. Accordingly, the Court now faces the question whether to approve settlement notwithstanding the government's objections.

## II.

### *Review of Settlement Agreement*

■ The Ninth Circuit has interpreted Section 3730(b)(4)(B), providing the qui tam plaintiff with "the right to conduct the action," to include the right to negotiate a settlement of the action if the government declines to intervene. *U.S. ex rel Killingsworth v. Northrop Corp.,* 25 F.3d 715 (9th Cir.1994) (*Killingsworth* ). Section 3730(d)(2) also reiterates the relator's right to settle the action if the government declines to intervene: "If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages."

■ Despite the relator's scope of responsibility to settle the action, the Ninth Circuit has interpreted the FCA to also require consideration of government interests. Therefore, upon a showing of good cause, the United States has the right to a hearing in court during which it can object to proposed settlement in a qui tam case in which it has not intervened. *U.S. ex rel Killingsworth v. Northrop Corp.,* 25 F.3d 715 (9th Cir.1994) (*Killingsworth* ). At such a hearing, the district court must review the settlement proposal to determine whether it is "fair and reasonable" as to the United States. *Id.* at 725. The United States possesses this right because it is "the real party in interest" in a qui tam case. *Id.* at 720. It need not intervene in the case to assert this right. *Id.* at 720,

724. *See also United States ex rel. Gibeault v. Texas Instruments Corp.,* 25 F.3d 725 (9th Cir.1994).

In *Killingsworth,* the relator and the defendant agreed to a settlement under which the defendant would pay $1 million to resolve the FCA claim and $3.2 million to resolve the relator/plaintiff's wrongful termination claim. 25 F.3d at 718. However, DOJ refused to consent to the settlement on the grounds that the parties had allegedly manipulated the monetary amounts to maximize the relator/plaintiff's own recovery at the expense of the government's recovery, since the government would receive no percentage of the proceeds allocated to the wrongful termination claim. *Id.* DOJ also contended that the defendant had failed to pursue a statute of limitations defense to the wrongful termination claim that might have precluded liability. *Id.* The relator and the defendant moved the district court to approve the settlement and to dismiss the case without DOJ's consent. *Id.* Although the relator and defendant subsequently agreed to reallocate the settlement amounts to apportion $1.5 million to the FCA claim and $2.7 million to the wrongful termination claim, DOJ still refused to consent, and the district court dismissed the action. *Id.*

■ On appeal, the Ninth Circuit observed that the legislative history of the FCA established Congress' intention to permit private individuals to take responsibility for litigation under the Act unless DOJ elected to intervene. 25 F.3d at 721–22. The court then held that the statute's requirement of government consent to a dismissal applies only at the initial stage, before DOJ decides to intervene. *Id* at 722 (discussing 31 U.S.C. § 3730(b)(1)–(4)). However, upon a good cause showing, DOJ is entitled to a hearing just as an objecting relator is entitled to a hearing under § 3730(c)(2)(B). Even if DOJ makes a good cause showing, the Court can approve the Settlement Agreement and dismiss the action with prejudice over DOJ's

objection if it finds the Agreement to be fair and reasonable. *See, for example, United States ex rel. Killingsworth v. Northrop Corp.*, No. 94–56599, 1995 WL 635100, 1995 U.S.App. LEXIS 31563 (9th Cir. Oct. 26, 1995) (*"Killingsworth II"*) (Exhibit 11 of Parties' Joint Memorandum) (affirming district court's approval of settlement on remand over DOJ's continued opposition).

■ In this case, as in *Killingsworth*, "neither the government nor the relator desires to engage in further litigation. If the parties settle the action without a dismissal and thereby effectively stop litigating the case, the trial court would undoubtedly dismiss the suit for failure to prosecute ..." *Id.* at 723. In this situation, an opportunity was afforded to the government to voice its objections at the December hearing. Accordingly, the Court now examines whether the terms of the settlement are fair and reasonable under all the circumstances.

The first question to be examined is whether the scope of the release language is "fair and reasonable" under all the circumstances. The Court has found that DOJ has failed to demonstrate that the proposed release renders the Settlement Agreement unfair or unreasonable. The allocation of the FCA settlement amount between Pratt, the government, and counsel appears to be fair and reasonable, given the extensive investigative assistance to DCIS and DOJ in their respective investigations. Indeed, as DOJ recognizes, the relator even worked personally with DCIS to record conversations and to transcribe the tapes. Therefore, the relator's active involvement in this case, coupled with his specific efforts to cooperate with the government and to further its investigation, justify both the allocation of 28 percent of the FCA proceeds to the relator—well within the 25 to 30 percent authorized by statute-and the allocation of $150,000 for attorney fees.

Although the claims made were extensive and far-reaching, implicating the entire workforce, DOJ declined to intervene in the case. However, DOJ investigated Pratt's FCA claims for nearly three years before announcing its decision not to intervene as to the non-INF claims. A subpoena was served on Alliant seeking production of all records and documents relating to all DOD, government and commercial contracts from 1992 to 1996. In addition to the subpoenas, DOJ lawyers and investigators conducted interviews with current and former employees of the company. Indeed, defendants, relator and his counsel conducted their own separate investigations, the results of which were disclosed to DOJ. Thus, not only did DOJ have the opportunity to investigate Pratt's allegations of labor mischarging and overcharging on non-INF programs, it had access to a wide range of information in its decision not to intervene.

However, DOJ now suggests limiting the proposed release to claims that involve 100 or fewer employees out of a plant that employs over 1,800 persons. The Court finds that this suggestion is somewhat unrealistic, given the incentives faced by the parties to continue litigating the action or to settle. They observe, "[n]o defendant, faced with an FCA lawsuit alleging broad claims of labor mischarging covering the entire workforce, could reasonably settle on such a limited basis." *Joint Memorandum at 3*. There are also policy considerations at hand; limiting the release would also deter the possibility of future settlements. "The government's ability to settle cases depends on its power to give defendants releases that will protect them from more litigation based on the same invoices. If the government cannot give a defendant such a release, then the defendant might as well go to trial." *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (9th Cir.1998). Therefore, the Court finds that the scope of the release is not unfair, unreasonable, or inadequate under these circumstances.

Second, the Court finds that DOJ's objection regarding the absence of a clause in the Settlement Agreement waiving Alli-

ant's right to recover its litigation costs as allowable costs of its government contracts to be unpersuasive. The allowability of Alliant's costs is already governed by the terms of Alliant's government contracts, the Federal Acquisition Regulations ("FAR"), and the federal procurement statutes.

The allowability of defense costs in a qui tam action is explicitly addressed in recent amendments to FAR 31.205–47. The regulation, which apparently took effect on December 29, 1998, includes "costs incurred in connection with any proceeding brought by a third party in the name of the United States under the False Claims Act" in the category of generally unallowable costs. However, in the case of settlement of such proceedings, a case by case determination of allowability is made:

> In the event of a settlement of any proceeding brought by a third party under the False Claims Act in which the United States did not intervene, reasonable costs incurred by the contractor in connection with such a proceeding, that are not otherwise unallowable by regulation or by separate agreement with the United States, may be allowed if the contracting officer, in consultation with his or her legal advisor, determines that there was very little likelihood that the third party would have been successful on the merits.

Federal Acquisition Regulation; Costs related to Legal/Other Proceedings, 63 Fed. Reg. 58, 599–600 (1998) (put into effect Dec. 29, 1998), codified at FAR 31.205–47(b), (c)(2). This amendment is no more than a clarification of existing law; it was put into effect to minimize the occurrence of common misinterpretations of the FAR's regulatory coverage. *See id* at 58. Put simply, the amendment confirms that federal regulations contemplate allowability of a contractor's legal costs in connection with a settled qui tam action, but that the issue is properly left to the specialized jurisdiction of the government contracting officer.

In addition, there are already procedures available to the parties should disputes over costs arise. The Federal Acquisition Regulations include regulations to govern such disputes. *See* FAR 31.201–2(d) ("The contracting officer may disallow all or part of a claimed cost which is inadequately supported."). In addition, the FAR sets out several factors to be considered in determining reasonableness and allocability. FAR 31.201–3 (reasonableness); FAR 31.201–4 (allocability).

Since the allowability of a contractor's legal costs in connection with a settled qui tam action will be determined on a case-by-case basis by the contracting officer (who will consider both the merits of the relator's case, in addition to the reasonableness of the expenditures), the Court finds that the absence of a disallowance provision fails to demonstrate the Settlement's unfair or unreasonable terms. Rather, the absence simply transfers jurisdiction of the dispute to various government contracting officers, subject to review by the Court of Federal Claims, the Board of Contract Appeals, and ultimately, by the Court of Appeals for the Federal Circuit. Since this is the proper mechanism to resolve disputes over allowability of costs, the absence of a provision explicitly governing this element is a neutral factor that does not detract from the fairness and reasonableness of the Settlement Agreement.

Furthermore, DOJ has failed to demonstrate that the parties' proposed allocation of the total settlement amount is unfair, inadequate, or unreasonable. As DOJ is well aware, the terms of a settlement agreement are reached through a difficult process of communication and compromise. In the end, the actual terms agreed upon reflect this process of compromise, but also serve to commodify the risks involved in litigation.

The terms of the settlement adequately reflect the risks incurred by the parties in further prosecution of the action. The untimely death of the relator himself signifi-

cantly compromises the likely success of his action. DOJ has failed to present a sound analysis of the risks of further litigation, simply asserting that the proposed $500,000 for the FCA claim is insufficient compared to the hundreds of millions spent on the relevant contracts. Yet DOJ inappropriately presumes that the relevant invoices presented were indeed false. DOJ's presumption of falsity directly contravenes the FCA's placement of the burden on DOJ (or the relator) to prove that Hercules' and Alliant's invoices were false *at trial;* before that point, the invoices should therefore be presumed to be proper until demonstrated otherwise. Ironically, DOJ has also stated that various events— evidentiary difficulties and delays, for example—substantially limited the ability of the United States to reliably evaluate the extent to which the relator's allegations were provable. Therefore, mere speculation of falsity, absent further investigation, should not preclude settlement without a demonstration of the likelihood that the terms themselves are unfair or unreasonable. Having declined to intervene, DOJ has no entitlement under Ninth Circuit law to refashion the Settlement Agreement to its liking.

Last, the question of subject matter jurisdiction—the central issue for Defendants' motion to dismiss—was stayed pending settlement negotiations. Furthermore, contrary to the United States' assertions, it is not at the heart of this matter. Relator contends that the different parties, different times, and types of transactions, invoices, programs, and contracts give rise to the conclusion that the actions are factually, and legally distinct from one another. These contentions, which address the heart of public disclosure and first-to-file inquires are often somewhat complex and fact-intensive. For this reason, some courts have approved qui tam settlements instead of delving into these questions. In full view of all of the relevant considerations, including the risks of litigation and the unfortunate death of the relator, the Court finds the distinctions drawn by relator's counsel between this action and the

*Hullinger* action to be persuasive. *See, for example, United States ex rel. Fallon v. Accudyne,* 97 F.3d 937, 940–41 (7th Cir. 1996) (refusing to consider defendant's jurisdictional challenge on public disclosure grounds to qui tam settlement entered into by defendant); *Stinson, Lyons & Bustamante, P.A. v. United States,* 79 F.3d 136, 137 (Fed.Cir.1996) (explaining procedural background of related case in which court approved a settlement after its dismissal based on public disclosure grounds). Even if the Government were correct in its belated contention that the *Hullinger* case preempts certain areas of the Pratt case, the undisputed remaining areas, including a new defendant and different contracts (i.e. START and Science and Aging programs) preserve the Court's jurisdiction over the case. *See Cooper v. Blue Cross and Blue Shield of Florida, Inc.* 19 F.3d 562, 566 (11th Cir.1994).

■ Perhaps the strongest reason to approve the settlement involves the evaluations of the parties themselves. According to the Defendant, "[t]he parties in this case assessed the strengths and weaknesses of their cases and decided that the terms embodied in the Settlement Agreement best served the interests of all involved." Reply Memorandum of Defendants at 17. Since DOJ has expressed no intention to prosecute the claims on which it bases its "objections," it is improperly requesting the Court to force relator to continue litigating the claims himself. The Ninth Circuit, however, expressly prohibits such involuntary servitude. The Ninth Circuit, in *Gibeault,* observed, "the Government may not both withhold its consent to settlement and refuse to intervene, thus forcing [Relator] and [the defendant] to continue litigating ..." 25 F.3d 725, 728. Similarly, in *Killingsworth,* should the settlement have failed, the court ruled that "the Government may not force Killingsworth and [the defendant] to continue litigation by refusing to consent to a settlement." *Killingsworth I,* 25 F.3d at 721. The same observations apply here. At no

time has DOJ offered to intervene; even when it was given an opportunity between December 14 and January 5 to reconstruct the settlement terms to address its objections, the parties failed to reach agreement. Accordingly, the Court finds that it is entirely appropriate, given the adequacy and reasonableness of the settlement, to approve of its terms, having considered DOJ's objections.

## IV.

### *Conclusion*

Accordingly, the Court hereby approves and adopts the Settlement Agreement between the parties. Under all of the circumstances, the settlement of the parties, wherein Hercules will pay $500,000, 72 percent of which ($360,000) is paid to the United States and 28 percent of which ($140,000) is paid to Pratt to settle the False Claims Act in this action, is fair, adequate, and reasonable.

Consistent with the terms of the Settlement Agreement between the parties, the Court hereby dismisses with prejudice all claims against Alliant and Hercules in the above-entitled action, including all claims for attorney's fees, costs and expenses.

The Court hereby enters a final judgment of dismissal dismissing the above-entitled action in its entirety with prejudice, consistent with the terms of the Settlement Agreement between the parties, but the Court retains jurisdiction over any disputes that may arise relating to the interpretation and/or implementation of the Settlement Agreement between Alliant, Hercules and the Relator.